UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
Case No. 1:26-cv-23865

| | |
|---|---|
| ANTON VOLKOV,<br><br>      Plaintiff,<br><br>   v.<br><br>VENTECH PARTNERS II, LP; VENTECH GP, LLC; FLORIDA OVERSEAS INVESTMENT CENTER, LLC d/b/a FLORIDA OVERSEAS INVESTMENT CENTER RC; SUNCOAST COMMUNITY PARTNERS, LLC; DESIGN DISTRICT DEVELOPMENT PARTNERS, LLC; and JULIE NORTON INDIVIDUALLY AND AS SURVIVING SPOUSE AND SUCCESSOR IN INTEREST OF BENJAMIN "ROY" NORTON,<br><br>      Defendants. | **JURY TRIAL DEMANDED** |

**COMPLAINT**

Plaintiff Anton Volkov ("Plaintiff" or "Volkov"), by and through his undersigned counsel, files this Second Amended Complaint against Defendants Ventech Partners II, LP ("VP2" or the "Partnership"); Ventech GP, LLC ("Ventech GP" or the "General Partner"); Florida Overseas Investment Center, LLC d/b/a Florida Overseas Investment Center RC ("FOIC" or the "Regional Center"); Suncoast Community Partners, LLC ("Suncoast"); Design District Development Partners, LLC ("DDDP" or the "Developer"); and Julie Norton individually and as surviving spouse and successor in interest of Benjamin "Roy" Norton (collectively, "Defendants"), and respectfully alleges as follows:

### I.     INTRODUCTION

1.      This action arises from a fraudulent EB-5 offering that induced Plaintiff, a foreign

1

national, to invest over $500,000 in a purported mixed-use development to secure immigration benefits under the EB-5 Immigrant Investor Program. Defendants' marketing and offering materials contained false and misleading statements and omitted material information concerning the project's development, use of proceeds, risk allocation, and immigration viability.

2.      Defendants represented that the Design 41 project would create approximately 555 jobs—well above the EB-5 threshold of ten per investor—and that Plaintiff's funds would be deployed through a secured loan for construction and tenant build-out. In fact, 295 of those jobs (53%) depended entirely on lease-up and sustained tenant operations at a building only 25% leased when Plaintiff invested. The offering materials presented these figures as established facts, without quantifying their sensitivity to leasing and timing contingencies and without the cautionary language required for safe-harbor protection under 15 U.S.C. § 77z-2(c)(1).

3.      Defendants concealed the Regional Center's troubled history. Fourteen days before Plaintiff's February 8, 2018 investment, FOIC's flagship EB-5 project—the Las Olas Ocean Resort—was hit with a $36.94 million foreclosure, *The Bancorp Bank v. 550 Seabreeze Dev. LLC*, No. 0:18-cv-60171-RNS (S.D. Fla. Jan. 25, 2018), and filed Chapter 11 weeks later, *In re 550 Seabreeze Dev. LLC*, No. 18-12193-RBR (Bankr. S.D. Fla. Feb. 26, 2018). Las Olas was not an unrelated failure: it involved the same Regional Center sponsor, the same controlling principal (the late Roy Norton, who personally solicited Plaintiff), the same immigration counsel (Roger Bernstein), and the same pattern of inflated metrics and inadequate disclosure.

4.      Defendant Julie Norton and her late husband controlled FOIC and, through affiliates including Suncoast Community Partners, LLC, exercised pervasive control over the General Partner, the Partnership, and the offering. FOIC is rated "Non-Transparent" on EB5Projects.com, reflecting its failure to file required I-924A annual reports with USCIS—a status

2

that directly threatened FOIC's regional center designation and Plaintiff's immigration prospects, and that Defendants concealed.

5.     After Plaintiff invested, Defendants refused to produce audited financials, books and records, and other partnership documents required by the Limited Partnership Agreement. Two other limited partners sued in Miami-Dade Circuit Court in 2023 to enforce their inspection rights. *Ballentine v. Ventech Partners II, LP*, No. 2023-020050-CA-01 (Fla. 11th Cir. Ct. July 21, 2023) and *Silkina v. Ventech Partners II, LP*, No. 2023-022252-CA-01 (Fla. 11th Cir. Ct. Aug. 30, 2023), true and correct copies of which are attached hereto as Exhibits 8 and 9, respectively.

6.     In February 2026, the Design 41 building sold for $72,000,000—exceeding the March 2018 "As Is" appraisal by 34.3% and the "Fully Leased" appraisal by 2.9%. *See* Bisnow, *Recently Foreclosed Coconut Grove Office Sells For More Than $1K Per SF* (Feb. 9, 2026). After satisfaction of the Bridge Capital construction loan (up to $24,000,000) and VP1's inter-creditor loan ($14,500,000), roughly $33,500,000 in gross proceeds remained—more than sufficient to repay VP2's invested capital of up to $5,000,000 plus 3.0% accrued interest. Plaintiff has received no principal, no interest, and no accounting. The robust sale price confirms that adequate proceeds existed to repay investors and that the fraud extended beyond the initial sale through a continuing scheme of concealment and self-dealing.

7.     Plaintiff asserts claims for securities fraud under Section 10(b) of the Exchange Act and Rule 10b-5; control-person liability under Section 20(a); violation of the Florida Securities and Investor Protection Act, Fla. Stat. § 517.301 (remedies under § 517.211); common-law fraud and fraudulent inducement; constructive fraud; breach of fiduciary duty; negligent misrepresentation; breach of contract; civil conspiracy; unjust enrichment; and violation of FDUTPA, Fla. Stat. § 501.204. Plaintiff seeks rescission or damages, disgorgement, punitive

3

damages, attorneys' fees, and all just relief.

## PARTIES

8.      Plaintiff Anton Volkov is a foreign national who, on or about February 8, 2018, invested $500,000 in VP2 through the EB-5 Program. Plaintiff also paid $50,000 in administrative fees to Florida Overseas Investment Center, LLC, making his total outlay $550,000. Plaintiff participated in the EB-5 Program with the expectation of obtaining lawful permanent resident status in the United States. As a foreign-national investor, Plaintiff lacked independent access to partnership financial information and was wholly dependent on Defendants for disclosure of material facts concerning the status of his investment, the deployment of funds, and the viability of the immigration petitions tied to his capital contribution.

9.      Defendant Ventech Partners II, LP ("VP2" or the "Partnership") is a Florida limited partnership formed on June 19, 2017, with its principal place of business at 6547 Midnight Pass Road, #3, Sarasota, Florida 34242. VP2 offered and sold limited partnership interests to EB-5 investors to finance the Design 41 mixed-use development project in Miami, Florida. The sole asset of the Partnership was its participation as a co-lender in an indirect secured loan to Design District Development Partners, LLC through an inter-creditor agreement with VP1. VP2 is a "person" within the meaning of the Securities Exchange Act and is liable as the issuer of the securities purchased by Plaintiff.

10.      Defendant Ventech GP, LLC ("Ventech GP" or the "General Partner") is a Florida limited liability company formed on March 20, 2010, with its principal place of business at 6547 Midnight Pass Road, #3, Sarasota, Florida 34242. Ventech GP is the General Partner of VP2 and, through its then manager Benjamin Roy Norton, oversaw acceptance of subscriptions, authorized disbursements, and administered the loan from VP2 to the Developer. Ventech GP owed fiduciary duties to Plaintiff and all limited partners under both the Limited Partnership Agreement and the

Florida Revised Uniform Limited Partnership Act of 2005.

11.      Defendant Florida Overseas Investment Center, LLC d/b/a Florida Overseas Investment Center RC ("FOIC" or the "Regional Center") is a Florida-based entity that was approved by USCIS as an EB-5 Regional Center on September 17, 2009, based on an I-924 application submitted on December 3, 2008. FOIC is designated to operate statewide across all 67 counties in Florida. FOIC participated in the marketing, sponsorship, and administration of the Partnership and the Design 41 project, serving as the regional center sponsor for EB-5 purposes, and provided the regional center platform for indirect job creation modeling. FOIC's contact person remains as the deceased Roy Norton, with an email at roy@eb5florida.com and a website at eb5florida.com. FOIC also served as a gatekeeper for immigration-related communications and documentation, increasing the reliance relationship between investors and FOIC.

12.      Defendant Suncoast Community Partners, LLC ("Suncoast") is a Florida limited liability company that serves as the managing member of Ventech GP, LLC. At all relevant times, Suncoast was controlled by the late Benjamin "Roy" Norton and Julie Norton, and through its management role exercised direct control over the General Partner and, in turn, the Partnership.

13.      Defendant Design District Development Partners, LLC ("DDDP" or the "Developer") is a Florida limited liability company that owns and operates the Design 41 mixed-use development at 112 NE 41st Street (also described as 112 NE 2nd Avenue), Miami, Florida. DDDP is the borrower under the loan from VP2 and Ventech Partners, LP, and is the entity that received and deployed EB-5 investor capital. In February 2026, DDDP sold the Design 41 building for $72,000,000.

14.      Defendant Julie Norton individually and as surviving spouse and successor in interest for her late husband, Benjamin "Roy" Norton, is an individual residing in Sarasota, Florida.

Julie Norton co-operated FOIC with the late Roy Norton. She is the registered agent for Suncoast Community Partners, LLC and has signed annual report filings and organizational documents for VP2, Ventech GP, and FOIC-related entities. Through these roles, she exercised control over the Regional Center and the General Partner and participated in oversight of the offering, marketing, and administration of the Partnership.

### NON-PARTY ENTITIES

15. Ventech Partners, LP ("VP1") is a Florida limited partnership also controlled by Roy Norton. VP1 raised $14,500,000 from 29 EB-5 investors to develop the Design 41 project, originally named "Museum Village." VP1 is a co-lender alongside VP2 in the loan to the Developer.

16. Bridge Capital Partners is the senior construction lender that provided a construction loan facility to DDDP of up to $24,000,000, which, if fully funded, would be senior to the EB-5 investors' loan.

17. Defendant Benjamin "Roy" Norton was an individual residing in Sarasota, Florida. Roy Norton was the manager of Ventech GP, LLC, and thus the controlling individual of the General Partner of VP2. He was also the principal and contact person for FOIC. Through Suncoast Community Partners, LLC, Roy Norton controlled the General Partner's operations, including oversight of investor subscriptions, fund deployment, immigration-related communications, and all material decisions concerning the Partnership and the Design 41 project. Roy Norton personally solicited Plaintiff's investment and directed the dissemination of the 2018 Executive Summary and other offering materials to Plaintiff.

### II. JURISDICTION AND VENUE

18. This Court has federal question jurisdiction under 28 U.S.C. § 1331 because Plaintiff brings claims under the Securities Exchange Act of 1934 and rules promulgated

6

thereunder. This Court has supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367 because those claims arise from the same nucleus of operative facts. The exercise of jurisdiction promotes efficiency and avoids inconsistent adjudications.

19. Personal jurisdiction exists over all Defendants under Florida's long-arm statute, Fla. Stat. § 48.193, and consistent with due process. Defendants transacted business in Florida, made or directed misrepresentations in Florida, operated a Florida-based offering and project, and caused injury in Florida in connection with the offer and sale of securities to Plaintiff. The exercise of jurisdiction accords with minimum contacts principles in view of Defendants' Florida-centric marketing, operations, and communications directed to or through Florida. *See Internet Sols. Corp. v. Marshall*, 39 So. 3d 1201, 1205 (Fla. 2010).

20. Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this District, including but not limited to offering and sale activities, investor communications, project operations, and the Design 41 project itself, which is located in Miami, Florida. Further, multiple Defendants reside within or transact business in this District.

### III. FACTUAL ALLEGATIONS

**A. The EB-5 Immigrant Investor Program and Materiality of Job-Creation and Transparency Representations**

21. The EB-5 Program, administered by U.S. Citizenship and Immigration Services ("USCIS"), permits qualified foreign investors to obtain lawful permanent residence in the United States by investing in a commercial enterprise that meets certain qualifications, including creating or preserving at least ten full-time jobs per investor. EB-5 investors therefore evaluate not merely financial return but also the probability that job-creation and sustainment requirements will be satisfied. For that reason, representations about job creation and the factual predicates for job

creation are presumptively material to a reasonable EB-5 investor.

22.     Under the EB-5 Program, foreign investors may invest $500,000 in a designated Targeted Employment Area ("TEA") or $1,000,000 in a non-TEA area. The Program was designed to stimulate the U.S. economy through job creation and capital investment by foreign investors. Congress created the Immigrant Investor Program in 1992 to set aside visas for participants who invest in commercial enterprises associated with regional centers approved by USCIS.

23.     USCIS-designated regional centers sponsor EB-5 projects and provide the platform through which indirect and induced job creation can be counted toward the ten-job requirement. Regional centers bear obligations to USCIS, including filing annual I-924A reports demonstrating compliance with the program's requirements. Because the regional center's reporting and recordkeeping practices affect immigration viability, representations about transparency and compliance are central to investor decision-making. In an EB-5 offering, investors commonly rely on the regional center and general partner to provide accurate, current information through the investment term and to promptly disclose material adverse developments.

**B.     Florida Overseas Investment Center, Its Principals, and the Significance of Track Record**

24.     FOIC was approved by USCIS as an EB-5 Regional Center on September 17, 2009, based on an I-924 application submitted on December 3, 2008. FOIC's principal was Roy Norton, and its operations are co-managed by Julie Norton. FOIC marketed itself as a sophisticated sponsor that selects and administers projects with professional rigor, stating that FOIC "requires that the investments [they] sponsor are developed and managed by experienced successful professionals." *See* EB5Florida.com (last visited Apr. 8, 2026). Defendants used that posture to obtain Plaintiff's reliance.

25.     The interlocking control structure—FOIC as sponsor, Ventech GP as general

partner, Suncoast as managing member, and DDDP as borrower—created concentrated decision-making power in the hands of Roy Norton and Julie Norton. That concentration elevated conflicts-of-interest risks, including incentives to maximize administrative fees and preserve insider control over information flows. Defendants did not provide Plaintiff with the level of disclosure that would allow an EB-5 investor to evaluate those conflicts or their practical implications.

26.     FOIC's I-924A transparency rating on EB5Projects.com is listed as "Non-Transparent." EB5Projects.com, Florida Overseas Investment Center RC Regional Center (last visited Apr. 8, 2026). This public designation means that FOIC failed to provide the requisite annual reporting and transparency documentation to maintain a transparent rating under USCIS's I-924A annual certification program. A reasonable EB-5 investor would have considered FOIC's transparency rating—and its implications for ongoing USCIS compliance and immigration-petition viability—important to his investment decision. Defendants' marketing of VP2 as a credible, professionally managed EB-5 offering, while simultaneously holding a "Non-Transparent" USCIS rating, constitutes an additional material omission.

**C.      The Las Olas / 550 Seabreeze History and EDGAR-Disclosed Litigation Facts**

27.     Defendants' solicitation of Plaintiff occurred against a backdrop of prior EB-5 related controversies and distressed outcomes involving the same Regional Center and its principals. FOIC, through immigration attorney Roger Bernstein, raised $30,000,000 from sixty Chinese EB-5 investors for the Las Olas Ocean Resort hotel project at 550 Seabreeze Boulevard, Fort Lauderdale, Florida. *See* Adversary Compl. ¶¶ 34–38, *Wang v. Las Olas Mezzanine Borrower LLC* (*In re 550 Seabreeze Dev. LLC*), No. 18-12193-PDR, ECF No. 108, at 7–8 (Bankr. S.D. Fla. July 16, 2018), a true and correct copy of which is attached hereto as Exhibit 4. The marketing brochure for that project represented total project costs of $89,040,000, comprising $30,000,000 in EB-5 investment from sixty investors at $500,000 each, a $30,000,000 new construction loan

9

facility from The Bancorp Bank, and $29,040,000 in developer equity.

28. Despite those representations, the Las Olas project failed catastrophically. The Bancorp Bank filed a foreclosure lawsuit on January 25, 2018—just fourteen days before Plaintiff Volkov's February 8, 2018 investment in VP2—alleging $36,940,000 in outstanding principal due. *See The Bancorp Bank v. 550 Seabreeze Dev. LLC*, No. 0:18-cv-60171-RNS (S.D. Fla. Jan. 25, 2018). The developer filed for Chapter 11 bankruptcy on February 26, 2018, eighteen days after Plaintiff's investment. *In re 550 Seabreeze Dev. LLC*, No. 18-12193-RBR (Bankr. S.D. Fla. Feb. 26, 2018). The project, originally scheduled for a March 2017 completion, remained partially unfinished. Ex. 4, ¶ 74. The EB-5 investors' $30,000,000 was at risk, and the security interest pledged for their benefit had never been properly recorded, leaving them without effective collateral protection. *Id.* ¶¶ 64–66, at 12–13.

29. None of this adverse history regarding the failure of FOIC's flagship Las Olas project—an offering managed by the same Roy Norton who controlled FOIC and solicited Plaintiff for VP2—was disclosed to Plaintiff at the time of his investment. The Las Olas failure is directly relevant to Plaintiff's claims because it demonstrates a pattern of FOIC-sponsored offerings that rely on optimistic projections while concealing material risks and adverse outcomes. The fact that the Las Olas project involved a "different entity" and "different property" does not diminish its materiality: the Las Olas project shared the same Regional Center sponsor (FOIC), the same controlling individual (Roy Norton), the same immigration attorney (Roger Bernstein), and the same pattern of presenting inflated valuations without adequate risk disclosure. A reasonable investor evaluating whether to entrust $550,000 to the same sponsor and the same controlling person would have considered the near-simultaneous foreclosure and bankruptcy of the sponsor's flagship project to be important information.

30. EDGAR filings by The Bancorp, Inc. further corroborate these facts. The Bancorp's periodic reports disclose that on July 16, 2018, certain investors in a hotel project of one of the bank's former borrowers, 550 Seabreeze Development LLC, filed an adversary action against the bank and others in the U.S. Bankruptcy Court for the Southern District of Florida (Ex. 4), alleging that the bank and others "defrauded plaintiffs into investing a total of $10.5 million in the project." The Bancorp, Inc., Annual Report (Form 10-K) (FY ended Dec. 31, 2019) (SEC EDGAR Accession No. 0001295401-20-000025), https://www.sec.gov/Archives/edgar/data/1295401/000129540120000025/tbbk-20191231x10k.htm, a true and correct copy of which is attached hereto as Exhibit 6.

31. The same EDGAR disclosures state that the note for the related loan was sold in the second quarter of 2018 and the loan was no longer on the bank's books, and that on November 1, 2018, the bankruptcy court entered an order dismissing claims against the bank for lack of jurisdiction without prejudice. EDGAR further reflects that the dismissal was without prejudice and that on February 7, 2019, certain investors filed a new action in Florida state court asserting fraud and related claims. *Id.* These EDGAR-disclosed facts are relevant because they corroborate, at minimum, that serious investor fraud allegations and litigation activity existed in connection with the Seabreeze Development during the period in which Defendants were operating EB-5 offerings and soliciting EB-5 investors. They also demonstrate that Defendants' narrative framing of "track record" and risk controls, offered without disclosure of material adverse outcomes and public disputes, was incomplete.

32. Plaintiff alleges that a side-by-side comparison of the Las Olas Ocean Resort marketing figures and the Design 41 marketing figures reveals a pattern of presenting inflated projections while omitting material risk disclosures. In the Las Olas offering, Defendants' affiliated

parties represented a completed appraised value of $101,270,000 against total project costs of $89,040,000 and claimed the EB-5 loan was "less than 30% of completed Appraisal Value." Las Olas EB-5 Brochure at 7–8, a true and correct copy of which is attached hereto as Exhibit 5. That project ended in bankruptcy. In the Design 41 offering, Defendants represented a "Fully Leased" appraised value of $70,000,000 against total project costs of approximately $43,800,000, and EB-5 debt of $24,500,000 representing approximately 35% of the fully-leased appraisal—a higher leverage ratio than the Las Olas offering. 2018 Executive Summary at 3, a true and correct copy of which is attached hereto as Exhibit 1. Both offerings were managed through FOIC and controlled by Roy Norton, and both used optimistic valuation metrics to reassure investors while understating downside scenarios. Yet Defendants at no time disclosed to Plaintiff the failed Las Olas track record when marketing Design 41.

### D.	The Design 41 Project and VP2 Offering

33.	VP1 was formed to raise EB-5 capital for the Design 41 project, originally named "Museum Village." VP1 raised $14,500,000 from 29 EB-5 investors to develop a seven-story mixed-use building at 112 NE 41st Street in Miami's Design District.

34.	As construction costs increased, VP2 was formed in July 2017 to attract additional EB-5 investors and to participate as an equal co-investor with VP1, expanding the total loan to up to $19,500,000. The money was to be used to fund the remodeling of common areas and tenant construction in order to lease the building to tenants.

35.	VP2's sole purpose, as stated in the Limited Partnership Agreement dated August 1, 2017, was to make and hold "the Loan," defined as "that certain indirect secured loan to be made from the Partnership to the Operating Company." The loan was to be made to DDDP through an intermediary holding company (DDDP3 Holdings, LP) and was secured by DDDP's ownership interest in the project, including the land, construction, and cash accounts.

36.     The loan from VP2 was subordinate to a construction loan from Bridge Capital Partners, which, if fully funded, would be $24,000,000. The building was appraised at over $60,000,000 when partially leased. This subordination meant VP2 investors occupied the lowest priority position in the capital stack: Bridge Capital held the senior construction loan of up to $24,000,000; VP1 held its $14,500,000 inter-creditor position; and VP2's funds of up to $10,000,000 were at the bottom. The practical effect was that, upon any liquidation or refinancing event, VP2 investors would receive repayment only after satisfaction of at least $38,500,000 in senior obligations ($24,000,000 Bridge Capital + $14,500,000 VP1). Against an "As is" appraisal of $53,600,000, VP2's effective equity cushion was approximately $15,100,000—a margin that Defendants did not quantify or explain in the offering materials.

**E.      Solicitation and Investment by Plaintiff**

37.     In late 2017 and early 2018, Defendants, through Roy Norton and FOIC, solicited Plaintiff to invest in VP2, a Florida-based EB-5 offering tied to the Design 41 project in Miami's Design District. Defendants disseminated an offering document titled "Design 41 Mixed Use Development, Miami, Florida" (the "2018 Executive Summary"), which represented that VP2 "was formed in July 2017" to "participate as an equal co-investor with Ventech Partners, LP as a lender in an indirect secured loan to Design District Development Partners" in the amount of $14,500,000, to be "expanded through VP1 up to a total of $19,500,000." Ex. 1 at 1.

38.     The 2018 Executive Summary stated that the loan was "subordinate to a construction loan from Bridge Capital Partners which if fully funded would be $24,000,000" and that "[t]he building was appraised (partially leased) at over $60,000,000 last year." *Id.* While Defendants disclosed the existence of the subordination, they did not quantify or explain the practical consequences of VP2's subordinated position, including the fact that VP2 investors would be repaid only after satisfaction of at least $38,500,000 in senior obligations. The bare disclosure

13

that the loan was "subordinate to a construction loan" does not immunize Defendants from liability where the offering materials simultaneously described VP2 as an "equal co-investor" with VP1— a characterization that, when read together with the subordination disclosure, created a confusing and misleading impression about VP2's actual risk position. A statement may be misleading not because it is literally false, but because it presents half-truths that create an overall misleading impression. *See Omnicare, Inc. v. Laborers Dist. Council Constructing Indus. Pension Fund*, 575 U.S. 175, 187–89 (2015).

39.     Defendants represented that a $500,000 "at risk" investment would be deployed in compliance with EB-5 requirements through a secured loan, that the project would create sufficient jobs for each investor, that investor protections would apply in substance, and that VP2 would "accept up to five additional investors at this time." Ex. 1 at 1-2.

40.     On or about February 8, 2018, FOIC issued an invoice to Plaintiff for $550,000, comprising a $500,000 limited partnership subscription in VP2 and a $50,000 administrative fee, a true and correct copy of which is attached hereto as Exhibit 3. The invoice directed Plaintiff to wire funds to Regions Bank, 2353 Stickney Point Rd, Sarasota, FL 34231 for the account of "Ventech Partners II, LP" at 6547 Midnight Pass Road #3, Sarasota, FL 34242. *Id.* Plaintiff executed subscription documents and transmitted $550,000 in reliance on Defendants' statements and omissions.

41.     Notably, the 2018 Executive Summary stated that "[a]dministrative and legal fees for filing I-526" were $65,000 plus a USCIS filing fee of $3,675, totaling $68,675 in non-investment costs. Ex. 1 at 2. Yet Plaintiff's invoice reflects only a $50,000 administrative fee—a $15,000 discrepancy from the stated fee schedule that was never explained to Plaintiff and raises questions about the allocation and ultimate disposition of administrative fee revenue among FOIC,

the Nortons, and the Partnership.

42.     The Subscription Agreement required Plaintiff to file or cause to be filed with USCIS a Form I-526 petition as soon as practicable following the investment. Upon information and belief, Plaintiff's I-526 petition was filed in connection with his VP2 investment. A true and correct copy of the Subscription Agreement is attached hereto as Exhibit 2.

**F.      Material Misrepresentations and Omissions in the Offering Materials**

43.     The 2018 Executive Summary for the Design 41 project, which was provided to prospective investors including Plaintiff, contained the following material misrepresentations and omissions, each stated with the particularity required by 15 U.S.C. § 78u-4(b)(1) and Fed. R. Civ. P. 9(b):

*(i)      Job Creation Representations*

44.     The offering materials stated that the Design 41 project would create a total of 555 new jobs, which was "over 14 jobs per investor," far exceeding the EB-5 requirement of ten jobs per investor. Ex. 1 at 5. The materials described the job creation breakdown as follows: hard construction costs of $14,493,000 multiplied by a final demand IMPLAN multiplier of 13.78, yielding 200 direct, indirect, and induced jobs; tenant improvement costs of $8,541,000 multiplied by 6.38 (indirect and induced only because construction exceeded two years for direct-job counting), yielding 54 indirect and induced jobs; plus additional jobs from retail (22), office (211), restaurant (62), and parking (6) operations. *Id.*

45.     Job creation figures upon which Plaintiff justifiably relied were false or misleading because 295 of the 555 projected jobs (53% of the total)—specifically, the retail (22), office (211), restaurant (62), and parking (6) components—were entirely dependent on lease-up and sustained tenant operations at a building that was only approximately 25% leased at the time of Plaintiff's investment, with mere Letters of Interest for an additional 20%. The 555-job figure was presented

as an established, near-certain outcome rather than as a speculative projection dependent on assumptions that Defendants knew or recklessly disregarded were unlikely to materialize in the near term. By presenting an aggregated "over 14 jobs per investor" figure without plain-language sensitivity and timing disclosure—that is, without quantifying the downside scenario of jobs sustained if the building remained at or near 25% to 45% occupancy—Defendants omitted facts necessary to make the job-creation narrative not misleading under Rule 10b-5.

46.     Defendants may contend that the 555-job projection was a "forward-looking projection" protected from liability under the safe-harbor provision, 15 U.S.C. § 77z-2(c)(1). This defense fails for multiple independent reasons.

47.     First, the safe harbor does not apply to initial public offerings or offerings of securities by a blank check company, and EB-5 limited partnership offerings lack the public reporting history and market analyst coverage that the safe harbor presupposes.

48.     Second, the 555-job figure was not accompanied by "meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 77z-2(c)(1)(A)(i). The offering materials did not identify the critical dependency on lease-up rates, did not quantify the consequences of failure to achieve substantially full lease-up, and did not disclose what assumptions about lease-timing and sustained operations underlay the 555-job figure.

49.     Third, even if some cautionary language existed, the safe harbor does not protect a forward-looking statement made "with actual knowledge . . . that the statement is false or misleading." 15 U.S.C. § 77z-2(c)(1)(B). As alleged herein, Defendants knew at the time of the offering that the building was only 25% leased and that 53% of the projected jobs were speculative.

### (ii)    I-526 and I-829 Success Rate Representations

50.    The offering materials upon which Plaintiff relied stated: "Twenty-nine EB-5 investors have received approvals of their I-526 petitions for residency in the US. Twenty-three have received approval of their I-829 petitions for removal of conditions. None have been denied." Ex. 1 at 2. This representation was misleading because: (a) it suggested a flawless track record when, in fact, the approvals related to VP1 investors whose investment was made under different circumstances and at a different time; (b) it implied that VP2 investors would enjoy similar success without disclosing the material differences in risk profile between VP1 and VP2, including VP2's subordinated position; and (c) it was presented alongside concealed information about FOIC's "Non-Transparent" I-924A rating, which directly threatened the Regional Center's ability to support future immigration petitions.

### (iii)    Capitalization and Use of Proceeds Representations

51.    The 2018 Executive Summary upon which Plaintiff relied represented total capital needed for the project of "approximately $43.8 million" and listed the following capitalization sources: EB-5 debt of $24,500,000 (comprising VP1 at $14,500,000 "already raised" and VP2 at $10,000,000), less $8,000,000 "retired via bridge loan"; bank debt of $21,000,000; and equity of $6,357,222. Ex. 1 at 3. The same document stated that a March 2018 appraisal valued the property at $53,600,000 "As is" and $70,000,000 "Fully Leased." *Id.*

52.    On its face, the gross stated sources sum to $51,857,222 ($24,500,000 + $21,000,000 + $6,357,222), which exceeds the stated total of $43,800,000 by approximately $8,057,222—a discrepancy that can only be resolved by netting out the $8,000,000 bridge-loan retirement, an interpretive step that was not transparently presented. Plaintiff alleges that this reconciliation dependency created a misleading impression that the capitalization table was self-

17

explanatory and obscured the effective leverage position of EB-5 investors. Defendants may argue that Plaintiff's "own reconciliation demonstrates that the numbers are in fact consistent once the netting adjustment is applied." But the fact that a sophisticated reader can reverse-engineer internal consistency through an undisclosed netting assumption does not render the presentation not misleading. The obligation under Rule 10b-5 is to present information in a manner that is not misleading *to a reasonable investor*—not to a forensic accountant performing reconciliations from incomplete data. The offering materials presented the capitalization table as self-explanatory; the need for an undisclosed interpretive step rendered it misleading.

53.     Plaintiff's high-level reconciliation shows that if EB-5 debt is reduced by the stated $8.0 million retirement, the EB-5 component becomes $16.5 million, and $16.5 million + $21.0 million + $6.357 million equals approximately $43.857 million, which aligns with the "approximately $43.8 million" figure. This means the offering's headline "total capital needed" number appears to embed a netting assumption that was not presented as a mandatory interpretive step.

### (iv)     Loan Security, Subordination, and the "Equal Co-Investor" Characterization

54.     The 2018 Executive Summary also described VP2 as an "equal co-investor" with VP1 in a loan to the Developer. Ex. 1 at 1. This characterization was misleading because, in fact, VP2's funds were subordinate to both the Bridge Capital construction loan (up to $24,000,000) and VP1's inter-creditor loan ($14,500,000). The characterization of VP2 as an "equal co-investor" implies parity of risk and repayment priority, which did not exist. Defendants may argue that the same document disclosed that VP2's loan was "subordinate to a construction loan from Bridge Capital Partners." *Id.* But a partial disclosure that contradicts or undermines a headline characterization in the same document does not insulate the headline characterization from

18

liability; rather, it demonstrates that the document, taken as a whole, presented a confusing and misleading picture. *Omnicare, Inc.*, 575 U.S. at 187–89 (2015) (a statement of fact that is misleading due to unstated assumptions or undisclosed context is actionable).

### (v)      *Exit Strategy Representations*

55.      The offering materials also represented that "[t]he building will be eligible for long term financing from banks and insurance companies sufficient to retire all debt upon leasing of approximately 75%," and that the building was "currently leased at approximately 25% and currently has Letters of Interest (LOI's) for an additional 20%." Ex. 1 at 4. This representation was misleading because it presented the exit strategy as achievable when, in fact, the building was far from the 75% leasing threshold, and the existence of mere "Letters of Interest" did not constitute binding commitments. The materials did not quantify the timeline required to achieve 75% occupancy from a 25% base, nor did they disclose what would happen to investor capital if the 75% threshold was not reached within the projected timeframe.

### (vi)      *Annual Preferred Payment Representations*

56.      The offering materials stated that the loan would be "structured with a 3.0% annual interest rate paid to Ventech which will then pay the EB5 investors a 3% preferred limited partnership distribution ($15,000 per year) to begin six months after investor's I-526 petition is approved and is paid twice a year." Ex. 1 at 3. For Plaintiff's $500,000 investment, the promised $15,000 annual distribution represents a 3.0% yield. However, the offering materials did not disclose the critical dependency of this distribution on DDDP's ability to make interest payments on the underlying loan, which in turn depended on the building achieving sufficient lease-up and operating income. Upon information and belief, Plaintiff has received none or substantially none of these promised preferred distributions.

### G. Material Omissions

57. Defendants failed to disclose the following material information to Plaintiff at the time of his investment:

58. **FOIC's "Non-Transparent" Rating.** Defendants did not disclose that FOIC's I-924A transparency rating on EB5Projects.com was listed as "Non-Transparent," indicating that FOIC had failed to file required annual reports with USCIS demonstrating ongoing compliance with its regional center designation. This omission was material because a non-transparent rating raised fundamental questions about FOIC's regulatory compliance and its ability to support investors' immigration petitions.

59. **Las Olas Ocean Resort Failure.** Defendants did not disclose that the Las Olas Ocean Resort, another FOIC-sponsored project, was the subject of a $36.94 million foreclosure action filed on January 25, 2018—just two weeks before Plaintiff's February 8, 2018 invoice—and that the developer had filed Chapter 11 bankruptcy on February 26, 2018. This omission was material because it demonstrated a pattern of failed FOIC-sponsored projects and raised serious questions about Roy Norton's and FOIC's competence and trustworthiness in managing EB-5 investments.

60. **Conflicts of Interest.** Defendants did not adequately disclose the extent to which Roy Norton and affiliated parties controlled the entire transaction—from the Regional Center (FOIC), to the General Partner (Ventech GP), to the managing member of the General Partner (Suncoast Community Partners), to the immigration process—creating pervasive conflicts of interest. Plaintiff could not assess the magnitude of these conflicts or the risks that insiders would prioritize their interests over investor protections.

61. **Failure to Provide Audited Financial Statements.** Defendants did not disclose, and subsequently failed to provide, audited financial statements required under Article XIV of the

20

Limited Partnership Agreement, which obligated the Partnership to maintain "[p]roper and complete records and books of account" and provide annual audited financial reports to limited partners. A true and correct copy of the Limited Partnership Agreement is attached hereto as Exhibit 10. This failure was systemic and ongoing, as evidenced by the lawsuits filed by fellow limited partners Ballentine and Silkina in 2023.

62. **Adverse Developments After Investment.** Defendants did not timely or fully disclose adverse developments affecting the Design 41 project after Plaintiff's investment, including delays in leasing, changes to the loan structure, and risks to achieving sufficient jobs for all investors. They also failed to disclose how immigration backlogs and program risks could affect sustainment periods and capital return timelines.

### H. Contradictory Statements and Concealment

63. Defendants made contradictory statements across different documents and time periods that concealed the truth from Plaintiff:

64. **Job Creation Contradiction.** In the 2018 Executive Summary, Defendants represented that the project would create 555 new jobs, or "over 14 jobs per investor." At the same time, the building was only approximately 25% leased, meaning that the office, retail, and restaurant job projections—which accounted for 295 of the 555 projected jobs—were entirely speculative and contingent on future leasing activity that had not yet occurred. Defendants knew or recklessly disregarded that presenting these projections as established facts, rather than aspirational estimates, was misleading.

65. **Investment Security Contradiction.** The offering materials represented that the EB-5 loan would be "secured by DDP's ownership interest in the Project including the land, construction, and cash accounts." However, this security interest was subordinate to Bridge Capital Partners' senior construction loan of up to $24,000,000 and VP1's $14,500,000 inter-creditor

position. Defendants presented the loan as "secured" without adequately disclosing that the EB-5 investors' security interest was junior and potentially worthless in the event of default on the senior loan.

66.     **Transparency Contradiction.** FOIC marketed itself as offering investments "professionally managed by experienced individuals with a record of successful investing" and claimed that FOIC "requires that the investments [they] sponsor are developed and managed by experienced successful professionals." This claim was contradicted by FOIC's "Non-Transparent" I-924A rating and by the systematic refusal to provide audited financial statements to limited partners.

67.     **Exit Strategy Contradiction.** The offering materials represented that the building would be refinanced or otherwise liquidated to retire all debt upon leasing of approximately 75%. In February 2026, the building was sold for $72,000,000. Upon information and belief, despite this substantial sale, Defendants have not returned Plaintiff's investment or provided any accounting of the disposition of sale proceeds. The last applicant accepted into the Partnership was on June 28, 2019, and the Partnership terminates in June 2026 unless extended by the General Partner.

68.     Defendants have suggested, expressly or by implication, that COVID-19 conditions explain underperformance, delays, inability to refinance, or inability to return investor capital. Plaintiff alleges that a COVID explanation is quantitatively testable and that contemporaneous public EDGAR disclosures provide relevant data about the local Miami Design District area's closure periods, tenant payment behavior, and submarket inventory and vacancy. This EDGAR-based context is relevant because it constrains what "COVID" can plausibly explain over time, particularly where Defendants' failures include multi-year refusal to provide audited financial statements and an absence of accounting through 2023–2026.

22

69.     A prospectus for mortgage backed securities describing the Miami Design District property states that the property was closed between March 19 and May 18, 2020 due to COVID-19 restrictions and closed for ten days in June 2020 due to civil unrest, and that as of reported dates in late 2020 and 2021 the property was open and operating with safety precautions and reduced hours.  Prospectus at T-43, A true and correct copy of the prospectus is attached hereto as Exhibit 11.

70.     These loan disclosures also reflect structured financial responses to COVID stress, including a loan modification that deferred debt service payments for May, June, and July 2020 and the establishment and funding of a quantified debt service reserve of $10,474,740 deposited on December 1, 2020, described as equal to six months of interest-only debt service on the "Miami Design District Whole Loan."  See Exhibit 11 at T-26.

71.     The disclosures also provide additional Miami-area economic and submarket metrics relevant to evaluating the plausibility of long-term COVID explanations in the Miami Design District area. They state that for 2019 the Wynwood–Design District submarket had approximately 3.5 million square feet of inventory, with a 10.2% vacancy rate and overall asking rents of $59.53 per square foot, and that within a 0.25-mile radius of the Miami Design District property the 2019 inventory was approximately 1.2 million square feet with a 6.7% vacancy rate and overall asking rents of $85.95 per square foot.  See Exhibit 11 at T-43.

72.     Plaintiff alleges that these disclosures undermine any simplistic, unquantified assertion that "COVID" alone explains an inability to account for investor funds, inability to provide required financial statements, or inability to return capital years later.  To the contrary, these disclosures show that COVID disruptions in the relevant market were time-delimited and were managed with quantified reserves and reopening measures, and that the submarket exhibited

23

specific inventory, vacancy, and rent metrics that are wholly inconsistent with a narrative of indefinite market collapse.

### I.      EDGAR-Disclosed Facts Connecting DDDP to the Miami Design District Area

73.      Public EDGAR filings also reference Design District Development Partners, LLC as a landlord for retail space in the Miami Design District in a separate dispute involving a public company tenant. Specifically, a Form 10-Q describes that on April 25, 2024, Design District Development Partners, LLC filed a lawsuit for eviction alleging non-payment of rent and that the parties entered into a settlement agreement on September 20, 2024, providing for back rent and termination of the lease effective September 30, 2024. *See* Gaucho Group Holdings, Inc. Form 10-Q filed Feb. 12, 2025, a true and correct copy of which is attached hereto as Exhibit 7.

74.      Plaintiff alleges that these disclosures are relevant to show that DDDP was actively operating as a commercial landlord in the Miami Design District area during the relevant period and was willing to pursue litigation remedies for non-payment. These facts support Plaintiff's allegations that tenant performance, leasing dynamics, and landlord enforcement actions are quantifiable variables that can and should have been transparently reported to EB-5 limited partners, particularly where Defendants' job-creation story depended on successful lease-up and sustained operations.

### J.      Defendants' Scienter

75.      Plaintiff alleges the following facts giving rise to a strong inference that Defendants acted with scienter—that is, with intent to deceive, manipulate, or defraud, or with severe recklessness—in making the misstatements and omissions described herein, as required by the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(b)(2). The following facts, taken collectively, give rise to a "strong inference" of scienter that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues &*

*Rights, Ltd.*, 551 U.S. 308, 314 (2007).

### (i)   *Motive and Opportunity — Financial Incentives Beyond Generic Fee Revenue*

76.    Defendants had both motive and opportunity to commit the alleged fraud. Roy Norton and Julie Norton controlled every entity in the offering chain—FOIC, Suncoast, Ventech GP, and through them VP2—and derived direct financial benefit from each investor's subscription through administrative fee revenue. The 2018 Executive Summary disclosed administrative and legal fees of $65,000 per investor. Ex. 1 at 2. For the target of ten VP2 investors, total fee revenue would have been $650,000, exclusive of USCIS filing fees. For the combined Ventech offerings (29 VP1 investors plus up to 10 VP2 investors), total administrative fee revenue approached $2,400,000. Defendants' incentive to minimize risk disclosures and omit adverse track-record information was directly proportional to this revenue stream.

77.    This is not a case of "generic motive" shared by every securities issuer, as Defendants have characterized it. Unlike a publicly traded company whose executives hold stock options—the paradigmatic "generic motive" that courts have found insufficient—Defendants here controlled a small, privately-held offering where the entirety of the administrative fee revenue flowed directly to FOIC and its principals. There were no independent board members, no audit committee, no compliance officer, and no regulatory oversight beyond USCIS—which FOIC itself was failing to report to, as evidenced by its "Non-Transparent" rating. The concentration of financial incentives in the hands of the same individuals who controlled all information flows and concealed adverse facts distinguishes this case from the "generic motive" cases on which Defendants rely. *Cf. Abrams v. Baker Hughes, Inc.*, 292 F.3d 424, 430 (5th Cir. 2002) (allegations of motive and opportunity must be considered in the totality of the circumstances).

78.    Moreover, the $15,000 discrepancy between the stated administrative fee ($65,000

25

per the 2018 Executive Summary) and the invoiced administrative fee ($50,000 per Plaintiff's invoice) raises additional questions about the disposition of fee revenue. Defendants have offered no explanation for this discrepancy, which suggests that the fee structure was opaque by design and that administrative revenues were allocated in a manner not disclosed to investors.

### (ii) *Temporal Proximity — The Las Olas Foreclosure and Contemporaneous Solicitation*

79.     The temporal proximity between the Las Olas foreclosure (January 25, 2018) and Plaintiff's VP2 investment (February 8, 2018) independently supports a strong inference of scienter. Defendants were aware of the foreclosure action because FOIC was the regional center for the Las Olas project and Roy Norton was the designated contact for FOIC. *See* EB5Projects.com FOIC profile (listing Roy Norton as contact; phone 813-766-5460; email roy@eb5florida.com). Roger Bernstein, the immigration attorney affiliated with FOIC, publicly stated that he "raised $14.5 million from 29 EB-5 investors" for Design 41 and "raised $30 million from 60 EB-5 investors" for Las Olas. *See* EB5Investors.com, "EB-5 investment immigrants at risk, a project in South Florida is facing a foreclosure" (Feb. 2, 2018).

80.     Defendants' argument that the Las Olas project involved a "different entity" and "different set of investors" and a "different property" misses the point. The relevance of the Las Olas failure is not that it had a direct operational effect on Design 41, but that it demonstrated a catastrophic failure of FOIC's prior EB-5 offering—an offering involving the same Regional Center sponsor, the same controlling individual, and the same immigration attorney—at the very moment Defendants were soliciting Plaintiff's investment on the strength of FOIC's purported "track record." A "nonculpable inference" that "Defendants may have viewed Las Olas and Design 41 as distinct projects with different risk profiles" is not "at least as compelling" as the inference that Defendants deliberately concealed the Las Olas failure to preserve their fee revenue stream.

*See Tellabs*, 551 U.S. at 314 (court must consider the "plausible, nonculpable explanations" but must find that they are at least as compelling).

81.     Defendants' decision to accept Plaintiff's $550,000 investment on February 8, 2018, without disclosing that FOIC's prior flagship project was simultaneously being foreclosed upon and was about to enter bankruptcy—while marketing VP2 on the strength of FOIC's purported track record—constitutes, at minimum, severe recklessness amounting to scienter.

### (iii)     Post-Investment Conduct as Evidence of Scienter

82.     Defendants have argued that post-investment conduct "does not bear on Defendants' state of mind at the time of the offering." This assertion is legally incorrect. While the PSLRA requires scienter "at the time the alleged violation occurred," post-investment conduct is routinely considered as circumstantial evidence of pre-existing intent. *See, e.g.*, *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 476 (6th Cir. 2014) ("subsequent events may be relevant to establishing scienter at the time of the representation"); *City of Cambridge Ret. Sys. v. Altisource Asset Mgmt. Corp.*, 908 F.3d 872, 882 (3d Cir. 2018) (post-statement evidence is relevant to the holistic scienter inquiry).

83.     Defendants' post-investment conduct further supports scienter. Despite the Limited Partnership Agreement's requirement to maintain proper books and records and to provide annual audited financial statements, Defendants systematically refused to provide the financial transparency required by the partnership agreement. Ex. 10 at §§ 14.1, 14.2. The Ballentine lawsuit filed July 21, 2023, and the Silkina lawsuit filed August 30, 2023 both alleged that Defendants refused to produce audited balance sheets, income statements, cash-flow statements, and capital account records. Exs. 8, 9. This pattern of withholding financial information from limited partners from 2018 through at least 2023—spanning five consecutive fiscal years—is inconsistent with

good-faith management and supports a strong inference that Defendants concealed information to prevent investors from discovering how funds were deployed and what value, if any, remained in the partnership.

84. The inference of concealment is further strengthened by the $72,000,000 sale in February 2026 and Defendants' failure to provide any accounting of the disposition of proceeds. If Defendants had acted in good faith, they would have provided limited partners with a transparent accounting upon the realization of the Partnership's sole asset. Instead, Defendants have remained silent, supporting the inference that the concealment was designed to benefit insiders at the expense of investors.

#### (iv)    The Holistic Scienter Analysis

85. Considered collectively, the scienter allegations here are far more than the sum of their parts. The strong inference of scienter arises from the totality of the following particularized facts: (a) Defendants' concentrated control of the entire offering chain, creating both opportunity and incentive to defraud; (b) the $2,400,000 in aggregate administrative fee revenue flowing directly to FOIC and its principals; (c) the concealment of the Las Olas foreclosure and bankruptcy at the very time Defendants were soliciting Plaintiff; (d) the concealment of FOIC's "Non-Transparent" I-924A rating; (e) the presentation of the 555-job figure as near-certain when 53% of projected jobs were speculative; (f) the misleading "equal co-investor" characterization that masked VP2's subordinated position; (g) the five-year pattern of refusing to provide audited financial statements; (h) the refusal to account for the $72,000,000 in sale proceeds; and (i) the $15,000 unexplained discrepancy in administrative fees.

86. No plausible, nonculpable explanation accounts for the totality of these facts. The inference that Defendants "operated an EB-5 offering in good faith" and "subsequently

28

encountered operational challenges" does not explain why Defendants concealed the Las Olas failure, why they concealed FOIC's Non-Transparent rating, why they refused for five consecutive years to provide audited financial statements, or why they failed to account for $72,000,000 in sale proceeds. The "good faith" narrative may explain one or two of these facts in isolation, but it cannot plausibly account for all of them. *See Tellabs*, 551 U.S. at 326 ("The inference that the defendant acted with scienter need not be irrefutable . . . but it must be strong.").

### K.      Loss Causation

87.      Plaintiff suffered loss causation as required by *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). Defendants have argued that Plaintiff fails to identify a "corrective disclosure or market event that revealed the alleged fraud and caused Plaintiff's loss." This argument misapprehends both the applicable legal standard and the factual allegations.

88.      First, the "corrective disclosure" model of loss causation—appropriate for publicly traded securities with efficient markets—is inapt for a private offering of limited partnership interests in an EB-5 vehicle. There is no public market for VP2 limited partnership interests and no public pricing mechanism through which a corrective disclosure could affect value. In this context, loss causation is established by showing that the misrepresented or concealed risks materialized and caused economic harm. *See Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 175 (2d Cir. 2005).

89.      Second, the concealed risks materialized in multiple concrete ways: (a) the speculative nature of the 555-job projection materialized when the building failed to achieve the lease-up necessary to sustain those jobs, directly impairing Plaintiff's immigration-benefit expectations; (b) the structural subordination risks materialized when VP2 investors were not repaid despite sufficient gross proceeds from the $72,000,000 sale; (c) the absence of audited reporting prevented Plaintiff from monitoring the status of his investment and taking protective

29

action; (d) Defendants' failure to account for $72,000,000 in sale proceeds deprived Plaintiff of his rightful share of the Partnership's value; and (e) FOIC's Non-Transparent status threatened the viability of Plaintiff's immigration petition.

90. Third, Defendants' argument that the $72,000,000 sale price "exceeded both the 'As Is' and 'Fully Leased' appraisals" and therefore Plaintiff "has not explained how the alleged misrepresentations caused any economic loss" is a non sequitur. The fact that the building sold for more than the appraised value is irrelevant to Plaintiff's loss if Defendants diverted, misappropriated, or failed to distribute the proceeds to which Plaintiff was entitled. Plaintiff's loss is not the decline in the project's value; it is the non-return of his $550,000 investment despite the existence of more than sufficient proceeds to satisfy all creditors, including VP2 investors. The loss was caused by Defendants' fraud, concealment, and self-dealing—not by market conditions or project underperformance.

91. Plaintiff's economic loss is no less than $550,000 in invested capital and administrative fees, plus accrued preferred distributions at $15,000 per year from the date distributions were due, plus lost time value of money, plus consequential immigration-related damages.

L.    The "Who, What, When, Where, and How"

92. In compliance with Fed. R. Civ. P. 9(b) and 15 U.S.C. § 78u-4(b)(1), Plaintiff states with particularity the circumstances constituting the alleged fraud:

93. The "who" includes VP2 (issuer); Ventech GP (General Partner); FOIC (regional center sponsor); Suncoast Community Partners (managing member of General Partner); DDDP (developer/borrower); Roy Norton (principal of Ventech GP, FOIC contact person, manager of General Partner); and Julie Norton (co-operator of FOIC, registered agent of Suncoast and VP2).

94. The "what" includes false statements and material omissions concerning: (a) job

30

creation representations of 555 new jobs; (b) I-526 and I-829 success rate representations; (c) capitalization and use of proceeds representations; (d) loan security and subordination; (e) exit strategy representations; (f) preferred distribution representations; (g) omission of FOIC's Non-Transparent I-924A rating; (h) omission of the Las Olas Ocean Resort foreclosure and bankruptcy; (i) omission of pervasive conflicts of interest; and (j) failure to provide audited financial statements. Ex. 1 at 1-4.

95.     The "when" includes: the June 19, 2017 formation of VP2; the August 1, 2017 execution of the Limited Partnership Agreement; the period from late 2017 through early 2018 when Defendants solicited Plaintiff; the February 8, 2018 issuance of the invoice to Plaintiff; the date on or about which Plaintiff wired $550,000 to the Partnership's bank account; and the continuing period thereafter during which Defendants failed to provide audited financial statements and concealed adverse developments.

96.     The "where" includes: the 2018 Executive Summary for Design 41; the Private Placement Memorandum; the Subscription Agreement; the Limited Partnership Agreement; the February 8, 2018 invoice from FOIC; marketing materials distributed by FOIC; and oral and written communications directed to Plaintiff by or on behalf of Defendants in Florida.

97.     The "how" includes: preparation and dissemination of offering materials containing material misrepresentations and omissions; solicitation of Plaintiff through FOIC and Roy Norton; acceptance of $550,000 from Plaintiff; failure to disclose the Las Olas bankruptcy and FOIC's Non-Transparent rating; fund deployment inconsistent with representations; systematic refusal to provide audited financial statements; failure to disclose adverse developments; and concealment of the disposition of the $72,000,000 sale proceeds.

98.     Plaintiff reasonably relied on Defendants' misrepresentations and omissions when

31

wiring his investment, and he suffered damages including the loss of the $500,000 investment, the $50,000 administrative fees, loss of immigration benefits, loss of promised preferred distributions, and consequential harms.

99.     Defendants used interstate wires and mails to perpetrate the scheme, including through offering documents, interstate bank wires to Regions Bank in Sarasota, Florida, and communications with USCIS.

### IV.     TIMELINESS OF CLAIMS AND TOLLING

100.     Plaintiff's claims are timely. This section addresses the applicable statutes of limitations and repose and explains in detail why each claim falls within the applicable limitations period—including by identifying the independently actionable continuing violations that bring each claim within the relevant time bar.

### A.     Federal Securities Fraud Claims (Section 10(b) and Rule 10b-5)

101.     Under 28 U.S.C. § 1658(b), as amended by the Sarbanes-Oxley Act of 2002, a Section 10(b) claim must be brought within the earlier of (1) two years after discovery of the facts constituting the violation, or (2) five years after such violation. 28 U.S.C. § 1658(b).

102.     Plaintiff's initial investment occurred on or about February 8, 2018. Defendants' violations, however, were not limited to the initial sale but constituted a continuing course of fraudulent conduct encompassing ongoing material omissions, affirmative failures to disclose required information, and schemes to defraud, each of which constitutes an independently actionable violation of Section 10(b) and Rule 10b-5 occurring within five years of the filing of this action. The Supreme Court has recognized that the statute of repose runs from the date of the "violation," 28 U.S.C. § 1658(b)(2), and where a defendant's fraudulent scheme involves discrete, independently actionable misstatements or omissions occurring at different times, each such act constitutes a separate "violation" with its own repose period. *See Cal. Pub. Emps.' Ret. Sys. V. ANZ*

*Sec., Inc.*, 582 U.S. 497, 505 (2017) (repose period runs from the date of the last culpable act or omission of the defendant).

103.     **(a) Each annual failure to provide required audited financial statements (fiscal years 2018 through 2025)**, in violation of Section 14.2 of the Limited Partnership Agreement, constitutes a continuing omission. These are not mere "post-sale administrative failures" or breaches of contract, as Defendants have characterized them. Rather, each annual refusal to provide audited financial statements constituted an ongoing omission of material fact "in connection with" the purchase or sale of securities because it was part of a scheme to defraud that began with the initial sale and continued through the concealment of the status and value of Plaintiff's investment. *See SEC v. Zandford*, 535 U.S. 813, 819–22 (2002) (adopting a flexible interpretation of "in connection with" the purchase or sale of a security, holding that a scheme that "coincides" with a securities transaction satisfies the nexus requirement even if the specific fraudulent act occurs after the sale). The failure to provide audited financials was not independent of the sale; it was the mechanism by which Defendants concealed the consequences of the fraud that attended the sale.

104.     **(b) Defendants' express or implied representations attributing project underperformance to COVID-19, made during 2020–2023**, which Plaintiff alleges were false or misleading in light of the EDGAR-disclosed market data showing time-bounded disruptions and substantial recovery in the Miami Design District. These COVID-era misrepresentations were not mere "partnership administration" but were affirmative statements designed to maintain Plaintiff's reliance on the initial investment decision and to prevent Plaintiff from seeking legal remedies. Each such statement was "in connection with" the purchase or sale of a security because it was designed to prevent Plaintiff from seeking rescission or other remedies that would have

33

unwound the transaction. *See Zandford*, 535 U.S. at 820–22.

105.    **(c) Defendants' failure to disclose or account for the February 2026 sale of the Design 41 building for $72,000,000** and the disposition of sale proceeds. This failure occurred within months of the filing of this action and constitutes a fresh omission "in connection with" the securities transaction because the sale was the liquidation event that determined whether investors would be repaid—the very event that the offering materials represented would occur.

106.    **(d) Defendants' continued withholding of partnership financial records through at least 2023**, as independently documented by the Ballentine and Silkina lawsuits filed in Miami-Dade County Circuit Court.

107.    Plaintiff could not have discovered, and in the exercise of reasonable diligence did not discover, the facts constituting the violations until, at the earliest, mid-to-late 2023, when the Ballentine and Silkina lawsuits filed in Miami-Dade County Circuit Court brought the scope of Defendants' concealment to public attention, with further discovery continuing through February 2026 when Defendants failed to account for the $72,000,000 sale proceeds. Accordingly, the two-year discovery period under 28 U.S.C. § 1658(b)(1) commenced no earlier than July 2023, and this action filed in April 2026 is timely.

108.    With respect to the five-year repose period under 28 U.S.C. § 1658(b)(2), the independently actionable continuing omissions described above—each annual failure to provide audited financial statements, COVID misrepresentations made during 2020–2023, and the failure to account for the February 2026 sale proceeds—constitute distinct violations occurring within five years of the filing of this action. The statute of repose is an absolute time bar that runs from the date of "such violation," 28 U.S.C. § 1658(b)(2), but where, as here, the fraudulent scheme involves discrete, independently actionable violations at different times, each violation carries its

own repose period. The violations described in the preceding paragraphs—including COVID-era misrepresentations made during 2020-2023, each annual refusal to provide required audited financial statements through 2025, and the failure to account for the February 2026 sale proceeds— each constitute a distinct "violation" with its own repose period.

109.    To the extent any court determines that the five-year statute of repose under § 1658(b)(2) bars claims based solely on the February 8, 2018 transaction, Plaintiff invokes the doctrine of equitable tolling and fraudulent concealment, specifying the following dates on which Defendants engaged in affirmative acts of concealment: (a) from on or about February 8, 2018 through at least 2023, Defendants systematically refused to provide audited financial statements and books and records despite obligations under the Limited Partnership Agreement; (b) on or about January 25, 2018 through February 26, 2018, and continuing thereafter through the present, Defendants concealed the Las Olas Ocean Resort foreclosure and bankruptcy; (c) at all relevant times from the date of Plaintiff's investment through the present, Defendants concealed FOIC's "Non-Transparent" I-924A rating; and (d) from on or about February 2026 through the present, Defendants have failed to provide any accounting of the $72,000,000 sale proceeds despite the Partnership's scheduled termination in June 2026.

110.    Plaintiff acknowledges that the Supreme Court has held that equitable tolling does not apply to statutes of repose. *See CTS Corp. v. Waldburger*, 573 U.S. 1, 8–9 (2014). Plaintiff does not rely on equitable tolling to overcome the statute of repose. Rather, Plaintiff relies primarily on the independently actionable continuing violations described in the preceding paragraphs, each of which carries its own repose period and does not require equitable tolling. Plaintiff preserves the equitable tolling argument solely as an alternative ground for timeliness to the extent any court construes the continuing omissions as relating back to the initial transaction.

### B.      Florida Securities and Investor Protection Act (§ 517.301)

111.    Claims under Fla. Stat. § 517.211 must be commenced within two years after the violation or within two years after discovery of the facts giving rise to the cause of action. Fla. Stat. § 95.11(4)(e). The five-year statute of repose under Fla. Stat. § 517.211(6) runs from the date of sale. For the same reasons stated above regarding the continuing violations, the independently actionable omissions occurring within the repose period—including each annual failure to provide audited financial statements and the failure to account for the February 2026 sale proceeds—bring the Florida securities claims within the limitations period. For the same reasons, Plaintiff could not have discovered the facts constituting the violation until, at the earliest, mid-to-late 2023.

### C.      Common-Law Fraud

112.    Florida common-law fraud is subject to a four-year statute of limitations under Fla. Stat. § 95.11(3)(j), which begins to run from the time the facts giving rise to the cause of action were discovered or should have been discovered with the exercise of due diligence. *Laney v. Am. Equity Inv. Life Ins. Co.*, 243 F. Supp. 2d 1347, 1355 (M.D. Fla. 2003). Plaintiff could not have discovered the facts constituting the fraud until, at the earliest, mid-to-late 2023. Filing this action in April 2026—within four years of that discovery date—this claim is timely under the statutory discovery rule.

113.    Defendants have argued that "public information—including the Las Olas foreclosure filing, the bankruptcy, and the EDGAR disclosures—was available well before July 2023" and that a "plaintiff exercising reasonable diligence would have discovered the alleged fraud years earlier." *See* Ex. 6. This argument fails because the publicly available information about the Las Olas foreclosure and bankruptcy disclosed only the failure of a different project, not the fraud in connection with VP2 or the Design 41 project. The reasonable-diligence standard does not require a plaintiff to conduct forensic investigations of publicly available court filings concerning

different entities and different projects to uncover the concealed fraud attending his own investment, particularly where the plaintiff is a foreign national who lacked independent access to partnership financial information and was wholly dependent on Defendants for disclosure of material facts. The fraud was not discoverable until the Ballentine and Silkina lawsuits revealed the pattern of concealment in mid-2023.

### D.        Breach of Fiduciary Duty and Constructive Fraud

114.    Claims for breach of fiduciary duty are subject to a four-year statute of limitations under Fla. Stat. § 95.11(3)(o). The discovery rule applies. Plaintiff could not have discovered the breaches until, at the earliest, mid-to-late 2023. Filing this action within four years of that discovery date, this claim is timely.

115.    Constructive fraud claims are subject to a four-year statute of limitations under Fla. Stat. § 95.11(3)(j). The discovery rule applies. Plaintiff could not have discovered the constructive fraud until, at the earliest, mid-to-late 2023. Filing this action within four years of that discovery date, this claim is timely.

116.    Defendants have argued that "to the extent the alleged fiduciary breaches consist of failures to provide financial statements required by the Limited Partnership Agreement, these claims are duplicative of the breach of contract claim and barred by the economic loss rule." This argument fails because the breach of fiduciary duty claims are not based solely on the failure to provide financial statements; they are based on affirmative misrepresentations, concealment of the Las Olas failure, concealment of FOIC's Non-Transparent rating, and self-dealing—all of which constitute torts independent of any contractual duty. Florida law recognizes that fraud in the inducement survives as an independent tort even where a contract governs the parties' relationship. *See Monco Enters. v. Ziebart Corp.*, 673 So. 2d 491, 492 (Fla. 1st DCA 1996); *Tiara Condo. Ass'n v. Marsh & McLennan Cos.*, 110 So. 3d 399, 406 (Fla. 2013) (the effort to roll back the economic

loss rule did not apply to fraudulent inducement or negligent misrepresentation). Moreover, the Florida Revised Uniform Limited Partnership Act of 2005 imposes fiduciary duties on general partners that exist independent of the partnership agreement, and breaches of those statutory duties are not subsumed by a contractual claim.

### E.      Negligent Misrepresentation

117.     Negligent misrepresentation claims are subject to a four-year statute of limitations under Fla. Stat. § 95.11(3)(j). The discovery rule applies. Plaintiff could not have discovered the negligent misrepresentations until, at the earliest, mid-to-late 2023. Filing this action within four years of that discovery date, this claim is timely.

### F.      Breach of Contract

118.     Breach of contract claims are subject to a five-year statute of limitations under Fla. Stat. § 95.11(2)(b). The Limited Partnership Agreement imposed ongoing obligations on Defendants, including the obligation to provide audited financial statements annually and to pay preferred distributions. Defendants' breaches were continuing in nature, with each failure to provide an annual audited financial statement and each failure to pay a preferred distribution constituting a separate breach. The most recent breaches—including the failure to provide any accounting of the $72,000,000 sale proceeds in February 2026—occurred well within the five-year limitations period. This claim is timely without resort to equitable tolling or fraudulent concealment.

### G.      Civil Conspiracy, Unjust Enrichment, and FDUTPA

119.     The statute of limitations for civil conspiracy is determined by the underlying tort. Because the underlying torts—fraud, breach of fiduciary duty, and securities fraud—are all timely for the reasons stated herein, the civil conspiracy claim is likewise timely.

120.     Plaintiff's unjust enrichment claim accrued, at the earliest, when Defendants failed

to return Plaintiff's investment and retained the benefits thereof. Defendants' retention of Plaintiff's funds is ongoing, and the most recent enrichment—the $72,000,000 sale of the Design 41 building in February 2026 without any return to Plaintiff—occurred within the four-year limitations period. This claim is timely.

121. FDUTPA claims are subject to a four-year statute of limitations. Fla. Stat. § 95.11(3)(f). Plaintiff could not have discovered the deceptive and unfair trade practices until, at the earliest, mid-to-late 2023. Filing this action within four years of that discovery date, this claim is timely.

### H. Equitable Tolling and Fraudulent Concealment

122. To the extent any Defendant argues that any claim is time-barred, Plaintiff affirmatively pleads that the applicable statute of limitations is tolled by the discovery rule, equitable tolling, and the doctrine of fraudulent concealment. Defendants engaged in a sustained and deliberate course of concealment from on or about February 8, 2018 through at least February 2026, including: (a) systematically refusing to provide audited financial statements and books and records despite obligations under the Limited Partnership Agreement, from February 2018 through at least 2023; (b) concealing the Las Olas Ocean Resort foreclosure filed January 25, 2018 and the subsequent Chapter 11 bankruptcy filed February 26, 2018, at all times from the date of Plaintiff's investment through the present; (c) concealing FOIC's "Non-Transparent" I-924A rating at all times; (d) issuing no or inadequate investor communications regarding adverse developments from February 2018 through the present; and (e) failing to provide any accounting of the $72,000,000 sale of the Design 41 building from February 2026 through the present despite the Partnership's scheduled termination in June 2026.

123. These specific acts of concealment prevented Plaintiff from discovering the facts giving rise to his claims until, at the earliest, mid-to-late 2023, when the Ballentine and Silkina

lawsuits (filed in Miami-Dade County Circuit Court in 2023) brought the scope of Defendants' concealment to public attention. Plaintiff's understanding of the full scope of the fraud continued to develop through February 2026, when Defendants failed to account for the $72,000,000 sale proceeds. Plaintiff exercised reasonable diligence at all relevant times.

## CAUSES OF ACTION

### COUNT I: Violation of Section 10(b) of the Securities Exchange Act and Rule 10b-5
### (Against All Defendants)

124.    Plaintiff realleges and incorporates the foregoing paragraphs as though fully set forth herein.

125.    The limited partnership interests in VP2 are "securities" within the meaning of Section 3(a)(10) of the Securities Exchange Act of 1934, 15 U.S.C. § 78c(a)(10), and constitute "investment contracts" under the test set forth in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946). Defendants offered and sold these securities through interstate means, including wires, telephone calls, emails, and written communications used for subscription solicitation, fund transfer, and immigration processing, thereby satisfying the jurisdictional requirements of Section 10(b), 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

126.    In connection with the offer and sale of VP2 securities, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce and the mails, and employed devices, schemes, and artifices to defraud; made untrue statements of material fact and omitted to state material facts necessary to make statements made not misleading; and engaged in acts, practices, or courses of business which operated as a fraud on Plaintiff, in violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(a)–(c), 17 C.F.R. § 240.10b-5(a)–(c). Each Defendant participated in the fraudulent scheme as a whole, and the scheme—which encompassed the initial solicitation, the continuing concealment of adverse information, the

systemic refusal to provide required financial transparency, and the failure to account for $72,000,000 in sale proceeds—constitutes a single, continuing scheme to defraud within the meaning of Rule 10b-5(a) and (c).

127. The specific misstatements and omissions, stated with the particularity required by 15 U.S.C. § 78u-4(b)(1), include: (a) the representation that the Design 41 project would create 555 new jobs ("over 14 jobs per investor"),when 295 of those jobs (53% of the total) were dependent on lease-up and sustained tenant operations at a building that was only 25% leased; (b) the representation of "approximately $43.8 million" in total project capital, which was internally inconsistent unless the reader independently netted out an $8,000,000 bridge-loan retirement; (c) the characterization of VP2 as an "equal co-investor" with VP1, when VP2's funds were subordinate to $38,500,000 in senior debt; (d) the omission of the Las Olas Ocean Resort project failure, including the January 25, 2018 foreclosure filing and February 26, 2018 bankruptcy, which occurred contemporaneously with Plaintiff's solicitation; (e) the omission of FOIC's "Non-Transparent" I-924A rating; (f) the omission of the fraud allegations raised in the adversary complaint filed by Las Olas EB-5 creditors on July 16, 2018; and (g) the continuing failure to provide audited financial statements and books and records from fiscal year 2018 through 2025. Exs. 1 and 4.

128. Defendants acted with scienter, as particularized in Paragraphs 75–86 above. They knew or were reckless in not knowing that the EB-5 offering contained material misrepresentations and omissions. Even knowing of adverse developments—including the Las Olas Ocean Resort failure, FOIC's Non-Transparent regulatory status, the subordinated and speculative nature of the investment, and the failure of the project to meet represented benchmarks—they continued to solicit and receive investor funds and failed to correct prior misstatements.

129. Plaintiff reasonably relied on Defendants' statements and omissions, including quantitative representations in the 2018 Executive Summary that were presented as reliable without adequate disclosure of dependency on lease-up, operating performance, and timing and attribution assumptions needed to satisfy EB-5 job requirements. 15 U.S.C. § 78u-4(b)(4).

130. Plaintiff suffered loss causation, as particularized in Paragraphs 87–91 above. The revelation and materialization of the true risks and deviations from the represented plan directly impaired the value of Plaintiff's investment and the immigration benefits integral to the investment decision. The truth about the speculative nature of job projections, the structural subordination risks, the absence of audited reporting, and Defendants' failure to account for proceeds—including proceeds from the February 2026 sale of the building for $72,000,000—impaired the value of the investment and the immigration-benefit expectations intertwined with the investment decision.

131. Plaintiff's economic loss is no less than $550,000 in invested capital and administrative fees, plus accrued preferred distributions at $15,000 per year from the date distributions were due, plus lost time value of money, plus consequential immigration-related damages.

**COUNT II: Control Person Liability under Section 20(a) of the Securities Exchange Act**
**(Against Julie Norton, Ventech GP, FOIC, and Suncoast)**

132. Plaintiff realleges and incorporates the foregoing paragraphs as though fully set forth herein.

133. Defendants Julie Norton, Ventech GP, FOIC, and Suncoast exercised power and control over VP2 and the content of the offering and investment-related statements, and had the power to control and did control the primary violations of Section 10(b) and Rule 10b-5 alleged in Count I.

134. Roy Norton was the manager of Ventech GP, which was the General Partner of

VP2, and was the principal of FOIC. Julie Norton co-operated FOIC and controlled Suncoast Community Partners, the managing member of Ventech GP. Through these interlocking relationships, they controlled every aspect of the offering, from marketing and investor solicitation to subscription acceptance, fund deployment, and regulatory compliance.

135.	Julie Norton is jointly and severally liable for the primary securities fraud violations alleged in Count I.  Julie and her late husband did not act in good faith and directly or indirectly induced the acts constituting the violations.

136.	This Count is derivative of the primary violation alleged in Count I. Plaintiff has adequately alleged a primary violation of Section 10(b) and Rule 10b-5 in Count I. *See Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 383 (5th Cir. 2004). Julie Norton, Ventech GP, FOIC, and Suncoast each qualify as "controlling persons" because they had the power to direct or cause the direction of the management and policies of VP2, including through the interlocking corporate relationships described herein.

### COUNT III: Violation of Florida Securities and Investor Protection Act, Fla. Stat. § 517.301, with Remedies under § 517.211
### (Against All Defendants)

137.	Plaintiff realleges and incorporates the foregoing paragraphs as though fully set forth herein.

138.	In order to establish a violation of Fla. Stat. § 517.301, a plaintiff must prove: (1) a misrepresentation or omission of a material fact; (2) justifiably relied on; (3) made in connection with a purchase or sale of securities; (4) with scienter or reckless disregard as to the truth of the communication; and (5) that the untruth was the direct proximate cause of the loss. *BJCC, LLC v. Lefevre,* No. 8:09-CV-551-T-17EAJ, 2012 U.S. Dist. LEXIS 110334, at *84 (M.D. Fla. July 27, 2012) (explaining the elements for Fla. Stat. § 517.301 are identical to Federal Rule 10b-5, except that negligence is sufficient to support scienter).

139.     Defendants, in connection with the offer or sale of securities, obtained money from Plaintiff by means of untrue statements of material fact and omissions, and engaged in schemes and practices operating as a fraud, in violation of § 517.301. The omitted facts included, among other things, the quantitative sensitivities underlying job projections and capitalization representations and adverse information relevant to evaluating the sponsor's track record and transparency practices. Plaintiff is entitled to rescission or damages under § 517.211, including recovery of consideration paid plus interest, or statutory damages if the security has been disposed of.

140.     This claim is timely for the reasons set forth in Paragraph 111 above.

### COUNT IV: Common-Law Fraud and Fraudulent Inducement
### (Against All Defendants)

141.     Plaintiff realleges and incorporates the foregoing paragraphs as though fully set forth herein.

142.     Defendants knowingly or recklessly made false statements and concealed material facts to induce Plaintiff's investment. The misrepresentations and omissions described herein were material, in that a reasonable investor would have considered them important in deciding whether to invest. Defendants made these misrepresentations and omissions with the intent to induce Plaintiff to invest $550,000 in the VP2 offering. Those communications included quantitative representations presented in a manner designed to convey reliability and safety, while omitting key dependencies and downside cases.

143.     Plaintiff justifiably relied on Defendants' misrepresentations and omissions when executing the Subscription Agreement and wiring $550,000 to the Partnership's bank account. Ex. 2.

144.     As a direct and proximate result of Defendants' fraud, Plaintiff suffered damages

including the loss of the $500,000 principal investment, $50,000 in administrative fees, loss of time value and opportunity, loss of promised preferred distributions, and impairment of expected immigration benefits.

145.    This claim is not barred by the economic loss rule because it is based on fraud in the inducement—that is, affirmative misrepresentations and concealment of material facts that induced Plaintiff to enter into the transaction in the first place. Fraud in the inducement constitutes an independent tort that survives even where a contract governs the parties' relationship. *See Monco Enters. v. Ziebart Corp.*, 673 So. 2d 491, 492 (Fla. 1st DCA 1996). The test for the economic loss rule is whether the fraud relates to an act of performance or to terms of the bargain; where, as here, the fraud induced the transaction itself, the economic loss rule does not bar recovery.

146.    This claim is timely for the reasons set forth in Paragraph 112 above.

**COUNT V: Breach of Fiduciary Duty**
**(Against Ventech GP, Julie Norton, FOIC, and Suncoast)**

147.    Plaintiff realleges and incorporates the foregoing paragraphs as though fully set forth herein.

148.    As General Partner of VP2, Ventech GP owed fiduciary duties to Plaintiff and all limited partners, including duties of loyalty, care, good faith, and full disclosure. These duties arise under both the Limited Partnership Agreement and the Florida Revised Uniform Limited Partnership Act of 2005.

149.    Julie Norton, as co-operator of FOIC and controlling person of Suncoast, likewise owed fiduciary duties to Plaintiff in connection with her management and control of the Partnership. FOIC and Suncoast, through her control of the General Partner and the offering, owed corresponding duties.

45

150.    Defendants breached their fiduciary duties by, among other things: (a) making material misrepresentations and omissions in connection with the offering; (b) failing to provide audited financial statements and books and records required under the Limited Partnership Agreement; (c) failing to disclose the Las Olas Ocean Resort foreclosure and bankruptcy; (d) failing to disclose FOIC's Non-Transparent regulatory status; (e) prioritizing their own financial interests over those of limited partners; (f) failing to provide any accounting of the $72,000,000 sale of the Design 41 building; and (g) operating the Partnership in a manner designed to benefit insiders at the expense of EB-5 investors.

151.    Defendants also breached fiduciary duties by failing to correct earlier quantitative narratives as actual facts diverged from projections. Plaintiff suffered damages as a direct and proximate result.

152.    These fiduciary duty claims are independent of the breach of contract claims. The fiduciary breaches include affirmative misrepresentations and concealment of material facts (the Las Olas failure, the Non-Transparent rating, the conflicts of interest) that exist independent of any contractual obligation. These are not merely duties to "provide financial statements" that sound in contract; they are duties of loyalty, care, and disclosure that arise from the fiduciary relationship itself.

153.    This claim is timely for the reasons set forth in Paragraph 114 above.

### COUNT VI: Negligent Misrepresentation
### (Against All Defendants)

154.    Plaintiff realleges and incorporates the foregoing paragraphs as though fully set forth herein.

155.    In the alternative, Defendants made material misstatements and omissions in the course of their business, supplying false information for the guidance of others in their business

transactions, without reasonable care or competence in obtaining or communicating the information. Defendants were in the business of soliciting EB-5 investments and owed a duty to provide accurate information to prospective investors. They failed to exercise reasonable care in preparing and disseminating the offering materials, the 2018 Executive Summary, and related communications to Plaintiff.

156.   Defendants held themselves out as capable of preparing reliable job-creation and capitalization narratives that investors could use for decision-making and immigration filings. The misrepresentations include both the headline quantitative figures and the omissions of sensitivity and reconciliation information necessary to avoid misleading impressions.

157.   Plaintiff justifiably relied on Defendants' misstatements and omissions to his detriment, and suffered damages including the loss of the $500,000 principal investment, $50,000 in administrative fees, loss of time value and opportunity, loss of promised preferred distributions, and impairment of expected immigration benefits.

158.   This claim is timely for the reasons set forth in Paragraph 117 above.

**COUNT VII: Breach of Contract**
**(Against VP2 and Ventech GP)**

159.   Plaintiff realleges and incorporates the foregoing paragraphs as though fully set forth herein.

160.   Plaintiff and VP2, through Ventech GP as General Partner, entered into the Subscription Agreement and the Limited Partnership Agreement dated August 1, 2017 (collectively, the "Agreements"). These Agreements constituted valid and enforceable contracts between Plaintiff and Defendants VP2 and Ventech GP.

161.   Under the Agreements, Defendants VP2 and Ventech GP were obligated to, among other things: (a) deploy Plaintiff's $500,000 investment in accordance with the stated use of

proceeds and the requirements of the EB-5 Program; (b) maintain "[p]roper and complete records and books of account" pursuant to Article XIV of the Limited Partnership Agreement; (c) provide annual audited financial statements and reports to limited partners; (d) pay Plaintiff a 3% preferred limited partnership distribution ($15,000 per year), to begin six months after approval of Plaintiff's I-526 petition, paid semi-annually; and (e) act in accordance with the terms of the Limited Partnership Agreement in administering the Partnership's affairs.

162. Defendants VP2 and Ventech GP breached the Agreements by, among other things: (a) failing to provide audited financial statements and books and records from the inception of the Partnership through at least 2023, despite repeated demands from multiple limited partners; (b) failing to pay any or substantially any of the promised 3% preferred distributions to Plaintiff; (c) failing to deploy funds in accordance with the stated use of proceeds and EB-5 Program requirements; (d) failing to provide any accounting of the $72,000,000 sale of the Design 41 building in February 2026; and (e) operating the Partnership in a manner inconsistent with the terms of the Limited Partnership Agreement, including by prioritizing the interests of insiders over the interests of limited partners.

163. Each annual failure to provide required financial statements and each failure to distribute promised amounts constituted continuing breaches with separate accrual dates. The most recent breaches—including the failure to account for the February 2026 sale proceeds—occurred well within the five-year limitations period under Fla. Stat. § 95.11(2)(b).

164. As a direct and proximate result of Defendants' breaches of contract, Plaintiff suffered damages including the loss of the $500,000 principal investment, $50,000 in administrative fees, loss of promised preferred distributions totaling at least $15,000 per year from the date distributions were to commence, loss of time value and opportunity cost of capital, and

impairment of expected immigration benefits tied to the EB-5 investment.

### COUNT VIII: Constructive Fraud
### (Against Ventech GP, Julie Norton, FOIC, and Suncoast)

165. Plaintiff realleges and incorporates the foregoing paragraphs as though fully set forth herein.

166. A fiduciary and confidential relationship existed between Plaintiff and Defendants Ventech GP, Julie Norton, FOIC, and Suncoast. As General Partner of VP2, Ventech GP owed fiduciary duties to Plaintiff and all limited partners under both the Limited Partnership Agreement and the Florida Revised Uniform Limited Partnership Act of 2005. Julie Norton, as one of the controlling individuals of Ventech GP, FOIC, and Suncoast, likewise occupied a position of trust and confidence with respect to Plaintiff and the other limited partners. FOIC, as the USCIS-designated regional center sponsor, occupied a position of trust with respect to Plaintiff's immigration-related interests.

167. Defendants breached the duties arising from these fiduciary and confidential relationships by taking unconscionable advantage of Plaintiff's trust and confidence. Defendants used their positions of control to benefit themselves at Plaintiff's expense, including by: (a) collecting $50,000 in administrative fees from Plaintiff through FOIC while concealing FOIC's "Non-Transparent" regulatory status and the catastrophic failure of the Las Olas Ocean Resort; (b) failing to provide audited financial statements and books and records that would have revealed the true status of Plaintiff's investment; (c) structuring the transaction to create pervasive, undisclosed conflicts of interest whereby Roy Norton and Julie Norton jointly controlled every aspect of the investment—from the Regional Center, to the General Partner, to the managing member of the General Partner—without adequate disclosure; and (d) retaining the benefits of the $72,000,000 sale of the Design 41 building without providing any accounting or return of capital to Plaintiff.

168. Constructive fraud does not require proof of intent to deceive but arises from the abuse of the fiduciary relationship itself. Even absent actual fraudulent intent, Defendants' conduct in taking advantage of their positions of trust and confidence to benefit themselves at Plaintiff's expense constitutes constructive fraud under Florida law. Here, Defendants' refusal to provide required audited reporting and their failure to provide a coherent accounting of investor capital and outcomes constitutes constructive fraud.

169. This claim is not "similarly deficient" to or "duplicative" of the breach of contract claim, as Defendants have contended. The constructive fraud claim is based on the abuse of a fiduciary relationship—an independent tort theory—and includes conduct (concealment of the Las Olas failure, concealment of the Non-Transparent rating, self-dealing) that is not cognizable under the breach of contract claim.

170. As a direct and proximate result of Defendants' constructive fraud, Plaintiff suffered damages including the loss of the $500,000 principal investment, $50,000 in administrative fees, loss of time value and opportunity, loss of promised preferred distributions, and impairment of expected immigration benefits.

171. This claim is timely for the reasons set forth in Paragraph 115 above.

## COUNT IX: Civil Conspiracy
### (Against All Defendants)

172. Plaintiff realleges and incorporates the foregoing paragraphs as though fully set forth herein.

173. Defendants agreed and conspired among themselves to commit the unlawful acts described herein, including securities fraud, common-law fraud, constructive fraud, and breach of fiduciary duty, in connection with the offer and sale of VP2 securities and the administration of the Partnership. The conspiracy involved an agreement between and among VP2, Ventech GP,

FOIC, Suncoast, DDDP, Roy Norton, and Julie Norton to market and sell VP2 limited partnership interests through materially false and misleading offering materials, to conceal material information from investors, and to operate the Partnership for the benefit of insiders at the expense of limited partners.

174.     In furtherance of the conspiracy, Defendants committed the following overt acts, among others: (a) Roy Norton and Julie Norton, through FOIC, prepared and disseminated materially false and misleading offering materials, including the 2018 Executive Summary, the Private Placement Memorandum, and the Subscription Agreement; (b) FOIC issued the February 8, 2018 invoice to Plaintiff for $550,000, directing Plaintiff to wire funds to the Partnership's account at Regions Bank in Sarasota, Florida; (c) Ventech GP accepted Plaintiff's subscription and $550,000 investment; (d) DDDP received and deployed the EB-5 investor capital; (e) all Defendants concealed the Las Olas Ocean Resort foreclosure and bankruptcy from Plaintiff; (f) all Defendants concealed FOIC's "Non-Transparent" I-924A rating from Plaintiff; (g) Ventech GP and Julie Norton systematically refused to provide audited financial statements and books and records to Plaintiff and other limited partners; and (h) all Defendants failed to provide any accounting of the $72,000,000 sale of the Design 41 building in February 2026.

175.     This Count depends on the existence of an underlying tort. *See Raimi v. Furlong*, 702 So. 2d 1273, 1284 (Fla. 3d DCA 1997). Plaintiff has adequately alleged the underlying torts of securities fraud, common-law fraud, constructive fraud, and breach of fiduciary duty in Counts I, IV, V, and VIII above.

176.     As a direct and proximate result of the conspiracy and the overt acts committed in furtherance thereof, Plaintiff suffered damages including the loss of the $500,000 principal investment, $50,000 in administrative fees, loss of time value and opportunity, loss of promised

preferred distributions, and impairment of expected immigration benefits.

### COUNT X: Unjust Enrichment
### (Against All Defendants, in the Alternative)

177.    Plaintiff realleges and incorporates the foregoing paragraphs as though fully set forth herein.

178.    In the alternative, and to the extent any express contract does not govern the subject matter of this claim, Plaintiff conferred a direct and substantial monetary benefit upon Defendants by investing $500,000 in VP2 and paying $50,000 in administrative fees to FOIC, for a total of $550,000. Defendants voluntarily accepted and retained these funds.

179.    The circumstances are such that it would be inequitable for Defendants to retain the benefit of Plaintiff's $550,000 without compensating Plaintiff. Defendants obtained Plaintiff's investment through material misrepresentations and omissions, failed to deploy the funds as represented, failed to provide the promised preferred distributions, failed to provide audited financial statements or any transparency regarding the status of investor funds, and failed to return Plaintiff's capital or provide any accounting of the $72,000,000 sale of the Design 41 building in February 2026. Defendants have been unjustly enriched at Plaintiff's expense.

180.    Defendants have argued that unjust enrichment is unavailable where an express contract governs the subject matter of the dispute, citing *Kovtan v. Frederiksen*, 449 So. 3d 343 (Fla. 3d DCA 2022). Plaintiff pleads this claim in the alternative, as permitted by Fed. R. Civ. P. 8(d)(2), to the extent the Court determines that any express contract does not govern the subject matter of this claim or that the contract is unenforceable. To the extent the breach of contract claim fails for any reason—including, for example, if the Court determines that certain Defendants were not parties to the Agreements—the unjust enrichment claim provides an alternative basis for recovery.

181.     As a result of Defendants' unjust enrichment, Plaintiff is entitled to restitution of the full $550,000 conferred upon Defendants, plus interest, and disgorgement of all profits, fees, and benefits Defendants derived from Plaintiff's investment, including any proceeds attributable to Plaintiff's investment from the $72,000,000 sale of the Design 41 building.

**COUNT XI: Violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat.**
**§ 501.204**
**(Against All Defendants)**

182.     Plaintiff realleges and incorporates the foregoing paragraphs as though fully set forth herein.

183.     The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.204, declares unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." FDUTPA is to be construed liberally to protect the consuming public from those who engage in unfair methods of competition or unconscionable, deceptive, or unfair acts or practices.

184.     At all relevant times, Defendants were engaged in "trade or commerce" within the meaning of Fla. Stat. § 501.203(8) by offering, marketing, soliciting, and administering EB-5 investment opportunities and providing immigration-related investment services to foreign national investors, including Plaintiff. Defendants held themselves out as experienced professionals capable of managing EB-5 investments in a manner that would yield both financial returns and immigration benefits, including lawful permanent resident status in the United States through the EB-5 Immigrant Investor Program.

185.     Defendants committed unfair, deceptive, and unconscionable acts and practices in connection with the provision of immigration-related investment services, including but not limited to: (a) making materially false and misleading representations regarding the number of jobs the Design 41 project would create, which was central to Plaintiff's ability to obtain

immigration benefits through the EB-5 Program; (b) misrepresenting the prior success rate of I-526 and I-829 petitions for VP1 investors as indicative of likely success for VP2 investors, when the risk profiles were materially different; (c) concealing that FOIC's I-924A transparency rating was "Non-Transparent," which directly threatened FOIC's ability to function as a regional center sponsor and, in turn, threatened Plaintiff's immigration prospects; (d) concealing the catastrophic failure of the Las Olas Ocean Resort, another FOIC-sponsored project that had entered foreclosure and bankruptcy at the very time Defendants solicited Plaintiff's investment; (e) failing to disclose pervasive conflicts of interest that compromised the integrity of the investment offering; (f) systematically refusing to provide audited financial statements and books and records; and (g) failing to provide any accounting of the $72,000,000 sale of the Design 41 building despite the Partnership's imminent termination.

186.    Defendants have argued that FDUTPA does not apply where claims arise from the offer and sale of securities, citing Fla. Stat. § 501.212(4), which exempts "any act or practice required or specifically permitted by federal or state law." This exemption does not apply here for two independent reasons. First, fraud is not "required or specifically permitted" by any law; it is prohibited. The exemption in § 501.212 shields lawful conduct required or authorized by regulatory frameworks—not fraudulent conduct that violates those frameworks. *See* Fla. Stat. § 501.212(1).

187.    Second, Plaintiff's FDUTPA claim is not based on the "offer and sale of securities" per se, but on the provision of immigration-related investment services—a distinct category of commercial activity that is not "required or specifically permitted" by federal or state securities law. FDUTPA protects consumers from unfair and deceptive practices in "any trade or commerce," and Defendants' marketing of immigration-linked investment services to foreign nationals falls

within that scope. The fact that the investment vehicle also constitutes a security does not immunize Defendants' broader commercial practices—including marketing, solicitation, and immigration service administration—from FDUTPA scrutiny.

188.    Notably, the § 501.212(4) exemption enumerates specific regulated entities—including those regulated by the Office of Insurance Regulation, the Office of Financial Regulation, and the Florida Public Service Commission—and does not include entities regulated by the Securities and Exchange Commission or the Florida Office of Financial Regulation acting in its securities regulatory capacity.

189.    Defendants' deceptive and unfair practices were particularly egregious because they were directed at foreign national investors who were relying on Defendants not only for financial returns but also for the attainment of critical immigration benefits. Plaintiff's decision to invest $550,000 was inextricably linked to his expectation of obtaining lawful permanent resident status through the EB-5 Program. By making false representations about job creation, concealing adverse information about FOIC's regulatory compliance, and failing to provide transparency regarding the status of the investment, Defendants exploited Plaintiff's immigration objectives to induce his investment and retain his funds.

190.    As a direct and proximate result of Defendants' violations of FDUTPA, Plaintiff suffered actual damages including the loss of the $500,000 principal investment, $50,000 in administrative fees, loss of time value and opportunity, loss of promised preferred distributions, impairment of expected immigration benefits, and the costs and expenses associated with attempting to obtain immigration benefits through a fraudulent investment vehicle. Plaintiff is entitled to actual damages, attorneys' fees and costs under Fla. Stat. § 501.2105, and declaratory and injunctive relief under Fla. Stat. § 501.211.

## V.    PLEA FOR PUNITIVE DAMAGES

191.    Plaintiff realleges and incorporates the foregoing paragraphs as though fully set forth herein.

192.    Pursuant to Fla. Stat. § 768.72, Plaintiff is entitled to an award of punitive damages against each Defendant. Defendants were personally guilty of intentional misconduct within the meaning of Fla. Stat. § 768.72(2)(a), in that they had actual knowledge of the wrongfulness of their conduct and the high probability that injury or damage to Plaintiff would result, and despite that knowledge, intentionally pursued their course of conduct, resulting in injury and damage to Plaintiff.

193.    Specifically: Defendants knew that the Las Olas Ocean Resort—another FOIC-sponsored project—had entered foreclosure on January 25, 2018, yet concealed this and solicited Plaintiff's $550,000 investment two weeks later (with bankruptcy following on February 26, 2018). They knew FOIC's I-924A transparency rating was "non-transparent," raising fundamental questions about its regulatory compliance, yet omitted it. They knew the 555-job projection was speculative and contingent on full lease-up of a building that was only 25% leased yet presented it as a near-certainty. They knew the EB-5 investors' loan was subordinate to a $24,000,000 senior construction loan yet marketed the investment as "secured" without adequate disclosure of that subordination. And they knew of pervasive conflicts of interest arising from the Nortons' joint control over every aspect of the transaction, yet failed to disclose them.

194.    In the alternative, Defendants' conduct was so reckless or wanting in care that it constituted a conscious disregard or indifference to the rights of Plaintiff within the meaning of Fla. Stat. § 768.72(2)(b). Defendants' systematic refusal to provide audited financial statements, their concealment of material adverse information, their failure to account for the $72,000,000 sale

56

proceeds, and their pattern of prioritizing insider interests over investor protections demonstrate gross negligence warranting punitive damages.

195.   With respect to Defendants VP2, Ventech GP, FOIC, Suncoast, and DDDP, punitive damages are warranted under Fla. Stat. § 768.72(3) because the officers, directors, and managers of these entities knowingly participated in, condoned, ratified, and consented to the conduct described herein, and these entities engaged in conduct that constituted gross negligence contributing to the loss, damages, and injury suffered by Plaintiff.

## VI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff Anton Volkov respectfully requests that the Court enter judgment in his favor and against Defendants, jointly and severally as applicable, awarding the following relief:

(a)    Rescission and restitution of the $500,000 investment and $50,000 administrative fee, together with interest, under Florida securities law and equity, or, in the alternative, compensatory damages in an amount to be proven at trial, including statutory interest;

(b)    Disgorgement of all profits, fees, and benefits received by Defendants from Plaintiff's investment;

(c)    Attorneys' fees and costs where authorized by statute or contract, including under Fla. Stat. § 517.211 and Fla. Stat. § 501.2105;

(d)     Pre- and post-judgment interest at the maximum lawful rate;

(e)    Punitive damages against each Defendant pursuant to Fla. Stat. § 768.72, in an amount sufficient to punish Defendants for their intentional misconduct and gross negligence and to deter similar conduct in the future;

(f)     An accounting and constructive trust over investor funds and proceeds, including proceeds from the February 2026 sale of the Design 41 building.

(g)     Declaratory and injunctive relief preventing further dissipation of investor funds and requiring production of all books and records;

(h)     Damages under the Florida Deceptive and Unfair Trade Practices Act, including actual damages, declaratory relief, and injunctive relief under Fla. Stat. § 501.211; and

(i)     All other relief the Court deems just and proper.

## VII.     DEMAND FOR JURY TRIAL AND REQUEST FOR EQUITABLE RELIEF

196.    Plaintiff demands a trial by jury on all issues so triable.

197.    Plaintiff alleges that without immediate equitable relief, Defendants may dissipate or conceal proceeds and records necessary to adjudicate Plaintiff's rights. Plaintiff therefore seeks expedited discovery and appropriate protective orders to preserve evidence and assets.

Dated: June 2, 2026                                LAW OFFICES OF ROBERT V. CORNISH, JR., PC

/s/ Kaitlin A. Harris
Kaitlin A. Harris (Florida Bar #1029115)
1395 Brickell Avenue, Suite 800
Miami, FL 33131
kharris@rcornishlaw.com
Tel: (305) 735-5450
Fax: (571) 290-6052

Attorneys for Plaintiff Anton Volkov